UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARTHUR J. ROUSE et al.,

         Plaintiffs,                       Case No. 20-11409

v.                                       HON. MARK A. GOLDSMITH

HEIDI E. WASHINGTON, et al.,

         Defendants.

_____/

## OPINION & ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 175)

Plaintiffs are individuals incarcerated at the Southern Michigan Temporary Facility (SMT), who bring this class action lawsuit against Defendants, current or former personnel and officials of either SMT or the Michigan Department of Corrections (MDOC), asserting that their Eighth Amendment rights have been violated because of Defendants' allegedly insufficient response to the danger of COVID-19. This matter is before the Court on Defendants' motion for summary judgment (Dkt. 175). For the reasons that follow, Defendants' motion is granted.[1]

### I. BACKGROUND

Plaintiffs filed this lawsuit in May 2020, alleging that Defendants were violating the Eighth Amendment by (i) failing to protect incarcerated people from contracting COVID-19 and (ii) failing to provide environmental conditions at SMT that adequately safeguarded against COVID-19. 2d Am. Compl. ¶¶ 92–99 (Dkt. 80). Claims against the Defendants in their individual

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motion, the briefing includes Plaintiffs' response (Dkt. 182) and Defendants' reply (Dkt. 184).

capacities were dismissed, see 6/15/21 Op. & Order (Dkt. 103), and the only remaining claim at this point in the litigation is an Eighth Amendment claim against Defendants in their official capacities.  See id.; 2d Am. Compl. ¶¶ 92–99.

The first presumed positive cases of COVID-19 in SMT occurred in March 2020.  Exec. Order 2020-04 at PageID.736 (Dkt. 68-3).  The MDOC worked with other government entities to craft a response to the COVID-19 pandemic.  See MDOC Director Heidi Washington Aff. ¶ 8 (Dkt. 73-2)).  Washington issued the first of many Director's Office Memoranda (DOMs) providing guidance about COVID-19 to MDOC wardens in April 2020.  See id. at ¶ 13.

Defendants have utilized a variety of measures to reduce transmission of COVID-19.  At various points during the pandemic, Defendants (i) implemented screening procedures for staff entering the facility,[2] (ii) ceased or restricted in-person visitation,[3] (iii) suspended transfers between facilities without approval of the Assistant Deputy Director,[4] (iv) conducted more frequent cleaning,[5] (v) provided increased access to soap,[6] (vi) published Centers for Disease Control and Prevention (CDC) posters detailing appropriate hygiene practices throughout SMT,[7]

---

[2] Mot. at PageID.3649 (citing Washington Aff. ¶ 9 (referencing a press release issued by MDOC in 2020 that discussed staff screening measures being taken by the MDOC)); Resp. at PageID.5456 (appearing to admit screening occurred but disputing its efficacy); see also Washington Aff. ¶ 10.

[3] Washington Aff. ¶ 10.

[4] Id.

[5] Id.

[6] Id.

[7] Id.

(vii) encouraged social distancing,[8] (viii) conducted parole interviews remotely,[9] (ix) instituted mask requirements,[10] (x) provided incarcerated people with masks,[11] (xi) established quarantine and isolation areas,[12] (xii) utilized mass COVID-19 testing during outbreaks of the virus,[13] (xiii) allowed bleach into the facility for cleaning,[14] and (xiv) engaged in contact-tracing of incarcerated people and staff by reviewing camera footage and, in the case of staff, by conducting employee interviews.[15]

As of the filing of this motion, the MDOC's current DOM required individuals at MDOC facilities to report close contacts, COVID-19 symptoms, and positive COVID-19 test results, and required MDOC facilities to screen individuals for COVID-19 symptoms before they entered the

---

[8] Id.

[9] Id.

[10] See DOM 2020–30 (Apr. 8, 2020) at PageID.739 (Dkt. 68-4).

[11] Pl. A Dep. at PageID.3723 (Dkt. 175-2) (testifying that the facility provided incarcerated people with masks early in the pandemic); Pl. B Dep. at PageID.3839 (Dkt. 175-3) (testifying that "they did give us masks," although indicating he believed the masks prisoners were given were inadequate); Pl. C Dep. at PageID.3980 (Dkt. 175-4) (testifying that MDOC provided him with masks when the pandemic started in March 2020).

[12] See DOM 2020–30 (Apr. 8, 2020) at PageID.740; Warden Dave Shaver Aff. ¶¶ 8–9 (Dkt. 68-5).

[13] Shaver Aff. at ¶ 20.

[14] Pl. A Dep. at PageID.3723–3725 (testifying that bleach spray was allowed into the facility during the pandemic, although also testifying that the spray bottles were often empty).

[15] Deputy Warden Jacob LaFave Dep. at PageID.4560–4562 (Dkt. 175-13) (testifying that close contacts could be identified by inference even if the contact occurred off-camera, because, for example, camera footage would capture two incarcerated people entering a restroom or a single cell even if there were no cameras in that space); Shaver Dep. at PageID.4271–4277 (Dkt. 175-8) (testifying about the contact tracing program at SMT that utilized employee interviews and video reviews); LaFave Dep. at PageID.4523–4524 (testifying that video review was used for contact tracing of incarcerated people).

facility and to establish quarantine and isolation areas. DOM 2022-21R11 at PageID.4859–4869 (Dkt. 175-18). Masks are still required for staff (i) working in healthcare settings, (ii) transporting prisoners to the hospital or to courts, (iii) entering visiting rooms, and (iv) performing COVID-19 screening including temperature checks or swabbing. Id. at PageID.4860.

In addition, Defendants have made the COVID-19 vaccine available to all prisoners at SMT. SMT Health Unit Manager Mark King Decl. at PageID.2665–2666, ¶¶ 7–8 (Dkt. 123). Four named Plaintiffs opted to receive the vaccine. Pl. A Dep. at PageID.3753; Pl. B Dep. at PageID.3847; Pl. C Dep. at PageID.3981; Pl. F Dep. at PageID.4172 (Dkt. 175-7). Two named Plaintiffs refused the vaccine, citing personal reasons and a fear of side effects. Pl. D Dep. at PageID.4054–4057 (Dkt. 175-5); Pl. E Dep. at PageID.4134–4135 (175-6). SMT also encouraged staff to get vaccinated. See SMT Vaccine E-mails, PageID.4422–4507 (Dkt. 175-12).

## II. ANALYSIS[16]

The Eighth Amendment protects individuals from "cruel and unusual punishments." U.S. Const. amend. VIII. "[W]hen the State [imprisons] . . . a person . . ., the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being." Helling v. McKinney, 509 U.S. 25, 32 (1993) (punctuation modified). If the state "fails to provide for [the prisoner's] basic human needs," such as "medical care[] and reasonable safety," the state "transgresses the substantive limits on state action set by the Eighth Amendment." Id. (punctuation

---

[16] In assessing whether Defendants are entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

modified).  "A prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  Farmer v. Brennan, 511 U.S. 825, 828 (1994) (punctuation modified).  As a result, "deliberate indifference to a prisoner's serious illness or injury states a cause of action under [18 U.S.C. §] 1983."  Estelle v. Gamble, 429 U.S. 97, 105 (1976).

The test for deliberate indifference under the Eighth Amendment has both a subjective and objective prong.  Farmer, 511 U.S. at 834.  To satisfy the objective prong, an incarcerated person "must show that he is incarcerated under conditions posing a substantial risk of serious harm."  Id. For purposes of this motion, Defendants do not contest that the risks posed by COVID-19 are sufficiently serious to satisfy the objective prong.  Mot. at PageID.3683.

The Court's analysis thus centers on the subjective prong.  Under this prong, "a prison official must have a sufficiently culpable state of mind," which in the context of prison-conditions cases "is one of deliberate indifference to inmate health or safety."  Farmer, 511 U.S. at 834 (punctuation modified).  "[T]he official [must] know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844.

The primary Eighth Amendment case related to prison conditions during the COVID-19 pandemic in this circuit is Wilson v. Williams, 961 F.3d 829 (6th Cir. 2020).  Regarding the subjective prong of the deliberate indifference analysis, the United States Court of Appeals for the Sixth Circuit explained that "[t]here [wa]s no question that the [the U.S. Bureau of Prisons] was aware of and understood the potential risk of serious harm to inmates at [the facility] through

exposure to the COVID-19 virus," given that incarcerated people at the facility had tested positive for the disease and multiple people had died.  Id. at 840.  As a result, "[t]he key inquiry [wa]s whether the BOP responded reasonably to this risk."  Id. (punctuation modified).

The Sixth Circuit vacated a preliminary injunction granted by the lower court, finding that the Wilson plaintiffs were unlikely to succeed on the merits of their Eighth Amendment claim because the BOP had likely responded reasonably to the risk of COVID-19 by "implement[ing] a six-phase action plan to reduce the risk of COVID-19 spread at [the facility]" and by "t[aking] preventative measures, including screening for symptoms, educating staff and [incarcerated people] about COVID-19, cancelling visitation, quarantining new [incarcerated people], implementing regular cleaning, providing disinfectant supplies, and providing masks."  Id. at 841. While "[t]he BOP initially struggled to scale up its testing capacity," its "efforts to expand testing demonstrate[d] the opposite of a disregard to a serious health risk."  Id.  The court held that even if the response was inadequate, the BOP "ha[d] not disregarded a known risk or failed to take any steps to address the risk . . . such that its response [fell] below the constitutional minimum set by the Eighth Amendment."  Id. at 843.

Defendants here have utilized many of the same mitigation strategies outlined in Wilson, including increasing the availability of cleaning supplies, screening for symptoms, cancelling visitation, and providing educational materials about how to reduce the transmission of COVID-19.  See supra, at 2–4.  Additionally, Defendants have offered vaccinations to all incarcerated people, a measure that was not available at the time Wilson was decided.  Wilson, 961 F.3d at 833.

Despite these measures, Plaintiffs argue that their Eighth Amendment rights have been violated because: (i) Defendants have not taken adequate steps to prevent the virus from entering SMT to begin with, given the difficulties of preventing transmission of COVID-19 in a carceral

setting once it has been introduced, Resp. at PageID.5487–5492; (ii) Defendants' COVID-19 response was unreasonable because the mitigation strategies were not adequately implemented, in that SMT employees routinely failed to wear masks, socially distance, enforce masking and social distancing for incarcerated people, provide Plaintiffs with soap and masks, and exclude symptomatic employees from the facility, id. at PageID.5487–5488; and (iii) Defendants' COVID-19 prevention strategies have become less effective over time, id. at PageID.5489, 5492.

**A. Inadequate Measures to Prevent COVID-19 from Entering SMT**

Plaintiffs argue that Defendants have responded unreasonably to the risks of COVID-19 because, given the risk of transmission once the virus enters SMT, Defendants have not taken adequate measures to prevent COVID-19 from entering SMT in the first instance.  Resp. at PageID.5487–5492.

Plaintiffs point out that the CDC has identified various factors that drive COVID-19 risk levels within carceral institutions—namely, COVID-19 community levels of transmission, vaccination coverage and current levels of transmission within the institution, the population's risk of severe health infections, and other facility structural and operational characteristics, including the density of housing arrangements and frequency of population turnover.  Id. at PageID.5486 (citing CDC Guidance on Prevention and Mgmt. of Coronavirus Disease 2019 in Corr. and Det. Facilities at PageID.5646–5647 (Dkt. 182-15)).

Plaintiffs argue that COVID-19 risk levels are elevated within SMT because SMT houses individuals who meet a set of criteria signaling that they may be immunocompromised.[17] As to facility structural and operational characteristics, Plaintiffs argue that it is difficult or impossible

---

[17] Id. (citing Dr. Carmen McIntyre Leon Dep. at PageID.5739–5740 (Dkt. 182-23)).

for incarcerated people to socially distance in some parts of the facility, and that incarcerated people and staff frequently move between units and interact with individuals from other units.[18] Plaintiffs argue that the difficulties enforcing mask requirements for incarcerated people and staff also increase the risk of transmission within SMT.[19]   Plaintiffs point to testimony from Robert Tylutki that once COVID-19 enters the facility, "it just explodes."   Id. at PageID.5490 (citing Tylutki Dep. at PageID.5616 (Dkt. 182-11)).

Because of the risk of transmission of COVID-19 within SMT's walls, Plaintiffs argue that Defendants have not taken adequate steps to prevent the virus from entering the facility.   Id. at PageID.5489.   For example, Plaintiffs argue that Defendants have been deliberately indifferent because: (i) staff do not have their temperatures taken when entering the facility, and, instead, screening questions are posted at the facility entrance, and staff with computers must answer a

---

[18] Resp. at PageID.5486–5487 (citing LaFave Dep. at PageID.5625–5626 (Dkt. 182-12) (testifying that it is "very difficult to socially distance in a cube setting," that incarcerated people are not able to socially distance while in their bunks in those cube-style housing units, and that prisoners sat in designated seats four or five feet apart in the chow hall); id. at PageID.5623–5624 (testifying that while cohorting measures were in place, incarcerated people from different units still interacted with one another in spaces including the chow hall and yard); Robert Days Dep. at PageID.5588–5589 (Dkt. 182-8) (testifying that he worked in each housing unit during the pandemic)).

[19] Resp. at PageID.5487 (citing Pl. A Dep. at PageID.5517–5519 (Dkt. 182-2) (testifying that SMT staff continuously failed to comply with masking and social distancing requirements); Pl. B. Dep. at PageID.5522 (Dkt. 182-3) (testifying that staff member Days and Unit Officer Robert Tylutki did not wear masks); Pl. E Dep. at PageID.5556 (Dkt. 182-5) (testifying that he saw officers failing to properly wear masks while sitting next to each other); Pl. F Dep. at PageID.5577, 5580 (testifying that he knew SMT staff members who would slowly eat to avoid having to wear a mask and confirming that Officer Lantis was the only officer he saw consistently wear his mask properly); Pl. C Dep. at PageID.5638–5639 (Dkt. 182-14) (testifying that prior to the mask mandate being lifted, more staff failed to wear masks than wore them, and appearing to testify that a number of officers in the quarantine unit were not wearing masks); Days Dep. at PageID.5590 (testifying that he did not wear his mask while eating or drinking which was "the majority of the day"); Shaver Dep. at PageID.5599–5600 (Dkt. 182-9) (testifying that when he was conducting weekly inspections, on average, he would see at least one staff member not wearing their mask properly)).

screening questionnaire when they log on the first time each day[20]; (ii) employees with mild symptoms that could be caused by COVID-19 are able to enter the facility[21]; (iii) COVID-19 positive but asymptomatic individuals are also likely able to enter the facility[22]; (iv) SMT employees with COVID-19 symptoms may be permitted to work if SMT is under contingency staffing[23]; and (v) "there are no longer any requirements that SMT conduct weekly testing of staff during COVID-19 outbreaks."[24]

However, Plaintiffs are not able to point to anything that constitutes an unreasonable response in the context of COVID-19. Some of Plaintiff's preferred procedures appear to be no

---

[20] Resp. at PageID.5490–5491 (citing Officer Todd Lyon Dep. at PageID.5570–5571) (Dkt. 182-6)); Mot. at PageID.3661; Resp. at PageID.5467.

[21] Resp. at PageID.5489 (citing Tylutki Dep. at PageID.5610 (testifying that he experienced individual symptoms including a fever, fatigue, and headaches, but all at different times, and that he reported those symptoms on a screening questionnaire when he had them, but stating, "it usually said, if I recall, it was three or more and if I had one it was just one . . . I don't ever recall having, say, multiple symptoms at once"); Lyon Dep. at PageID.5561 (testifying that if he had a headache, he would report it on the screening questionnaire, but that nothing happened "because I had only one symptom, and it was a headache," and stating that he "believe[d] it was like three symptoms" that were required to get flagged via the screening procedure); LaFave Dep. at PageID.5628, 5633 (testifying that it was a possibility that employees might have an incentive to lie for purposes of a COVID-19 screening questionnaire to avoid being sent home without pay if they did not have sick leave available and testifying that staff would have an incentive to lie if they were violating COVID protocols)).

[22] Resp. at PageID.5489 (citing Tylutki Dep. at PageID.5614 (stating, "Right now we're not testing, so if you walk in and if you're asymptomatic, it is what it is," and testifying that he did not think there was anything that would prevent an asymptomatic carrier from bringing COVID-19 into SMT); LaFave Dep. at PageID.5627 (testifying that the screening questionnaire would not necessarily catch an asymptomatic person)).

[23] Resp. at PageID.5491 (citing DOM 2022-21R12 at PageID.5686 (Dkt. 182-18) (stating that during contingency staffing, staff with COVID-19 symptoms or who test positive for COVID-19 can return to work after five days if they have no symptoms or mild symptoms that are resolving)).

[24] Resp. at PageID.5491 (citing Mich. Dep't of Health and Human Servs. Jan. 13, 2022, Emergency Order on Prison Conditions (Dkt. 182-22)).

longer effective or operative.  For example, temperature checks do not appear to be recommended by the CDC at this point in the pandemic.[25]  The CDC now lists offering masks to residents and staff as a "Strategy for Everyday Operations," but universal indoor masking and routine screening testing are listed only as "Enhanced COVID-19 Prevention Strategies," which should be adopted as feasible when the risk is elevated.[26]  The fact that some staff members might be inside the building before they answer the COVID-19 screening questions also does not indicate deliberate indifference; presumably employees understand that they will be required to leave the facility if they do not satisfy the screening procedure and would have little incentive to enter the building just to be sent home.  Finally, Defendants' decision not to bar any individual with mild symptoms—including symptoms like headache and fatigue—that could be caused by any number of illnesses does not reflect deliberate indifference.

According to Wilson, the subjective prong of the Eighth Amendment test is not met where prisons take affirmative actions—even if inadequate—to prevent and mitigate the spread of COVID-19, rather than "disregard[] a known risk or fail[] to take any steps to address the risk." 961 F.3d at 843.  It is undisputed that Defendants have taken affirmative steps to screen employees for COVID-19 symptoms, even if this screening occurs once staff are already inside the building. Moreover, it is undisputed that Defendants have made the vaccine available to all prisoners at SMT, have encouraged staff to get vaccinated, and have established isolation and quarantine locations for incarcerated people who test positive for COVID-19, among other measures.

---

[25] See CDC, Guidance on Management of COVID-19 in Homeless Service Sites and in Correctional and Detention Facilities, available at https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-correctional-settings.html (last updated Nov. 29, 2022) (last accessed Mar. 16, 203, 2023) (Nov. 2022 CDC Guidance).

[26] Id.

Plaintiffs' complaints about Defendants' screening procedures do not render Defendants' response as a whole unreasonable.

**B. Implementation**

Plaintiffs argue that Defendants have been deliberately indifferent to the risks posed by the COVID-19 pandemic because some of the COVID-19 prevention strategies Defendants chose to utilize were not adequately implemented or enforced.  Resp. at PageID.5488.  For example, Plaintiffs point to testimony that SMT routinely failed to exclude symptomatic employees from

work,[27] and that SMT employees routinely failed to wear masks,[28] socially distance,[29] or provide

Plaintiffs with soap.[30]  Plaintiffs also point to testimony that employees at SMT failed to enforce

---

[27] Resp. at PageID.5488 (citing Pl. A Dep. at PageID.5507 (testifying that he had been in contact with "lots" of MDOC employees with COVID-19 symptoms in March and April 2020); id. at PageID.5508–5509 (testifying that he had observed three MDOC employees with COVID-19 symptoms during the 2021–2022 Omicron outbreak); id. at PageID.5509–5510 (testifying that Tylutki bragged about being permitted to enter work while ill with a temperature in excess of that permitted by MDOC policy at the time); id. at PageID.5520 (testifying that two or three staff members were "obviously sick" at work in 2022); Pl. B. Dep. at PageID.5531 (testifying that he was in contact with a symptomatic MDOC employee around the time he (Plaintiff B) got infected); Pl. D Dep. at PageID.5545 (Dkt. 182-4) (testifying that he saw Lyon "sniffling and coughing" at SMT in late 2021 and when he tried to report it to another staff member, he was told to mind his own business); Pl. E Dep. at PageID.5553–5554 (testifying that in May 2020 he saw two officers working while exhibiting symptoms of COVID-19, one of whom was Officer Tylutki); Pl. F Dep. at PageID.5579 (testifying that Officer Uchendu was working with symptoms because SMT was short-staffed); Tylutki Dep. at PageID.5612 (testifying that Officer Bunting was "coughing really bad" at work and stating his belief that Bunting "was trying to tough it out")).

[28] Resp. at PageID.5488 (citing Pl. B. Dep. at PageID.5522 (testifying that Days and Tylutki did not wear masks after April 2020); Pl. E Dep. at PageID.5556 (testifying that he saw officers failing to properly wear masks while sitting next to each other); Pl. F Dep. at PageID.5577, 5580 (testifying that he knew SMT staff members who would slowly eat to avoid having to wear a mask and confirming that Officer Lantis was the only officer he saw consistently wear his mask properly); Pl. C Dep. at PageID.5638–5639 (testifying that prior to the mask mandate being lifted, more staff failed to wear masks than wore them, and appearing to testify that a number of officers in the quarantine unit were not wearing masks); Days Dep. at PageID.5590 (testifying that he did not wear his mask while eating or drinking which was "the majority of the day"); Shaver Dep. at PageID.5599–5600 (testifying that when he was conducting weekly inspections, on average, he would see at least one staff member not wearing their mask properly)).

[29] Resp. at PageID.5488 (citing Pl. A Dep. at PageID.5517–5519 (testifying that SMT staff continuously failed to comply with masking and social distancing requirements)).

[30] Resp. at PageID.5488 (citing Pl. B Dep. at PageID.5525 (testifying that the soap dispensers in the bathrooms would be empty for weeks at a time); Pl. F Dep. at PageID.5581–5582 (testifying that he observed Officer Lyon refuse to give a prisoner soap)).

social distancing and mask rules for incarcerated people[31] and to provide Plaintiffs with masks.[32] Finally, Plaintiffs point to testimony that they believe indicates flaws in Defendants' contact tracing protocols. Resp. at PageID.5488 (citing Shaver Dep. at PageID.5560 (describing contact tracing process); LaFave Dep. at PageID.5619–5621 (testifying that contact tracing was conducted by reviewing footage from cameras and testifying that there are areas in SMT where prisoners go where there are no cameras); id. at PageID.5631–5632 (testifying that the contact tracing protocol was no longer used at times when SMT was on outbreak status)).

Plaintiffs, therefore, seek to distinguish their case from Wilson on the grounds that in this case there is a genuine dispute of material fact as to "whether Defendants provided adequate masks, soap, and cleaning supplies" and "whether SMT enforced mask and social distancing requirements." Resp. at PageID.5490.

Overall, however, there is undisputed evidence that Defendants adopted reasonable procedures to mitigate the risks of COVID-19 and implemented these procedures to at least some extent, though perhaps not without flaws. See supra, at 2–4. The Sixth Circuit has made clear that perfection is not required of prisons seeking to address the risks of COVID-19. See Wilson, 961

---

[31] Resp. at PageID.5488 (citing Pl. B Dep. at PageID.5527–5529 (testifying that social distancing was almost never enforced); Pl. D Dep. at PageID.5544, 5547–5548 (testifying that social distancing in the chow hall line was not enforced and it was more common for SMT staff to not enforce social distancing and mask requirements); Pl. F Dep. at PageID.5578 (testifying that social distancing was not enforced in the line for the chow hall)).

[32] Resp. at PageID.5488 (citing Pl. A Dep. at PageID.5505 (testifying that plaintiff was denied masks at least five times during the pandemic); Pl. D Dep. at PageID.5533, 5536–5537 (testifying that plaintiff was denied masks on several occasions); Pl. F Dep. at PageID.5573–5575 (testifying that plaintiff was provided with only eleven masks during the entire pandemic despite frequent requests and stating that he was threatened with a misconduct ticket for not leaving the desk when requesting a mask)).

F.3d at 843; <u>Cameron v. Bouchard</u>, 815 F. App'x 978, 986 (6th Cir. 2020); <u>Dykes-Bey v. Washington</u>, No. 21-1260, 2021 WL 7540173, at *3 (6th Cir. Oct. 14, 2021).

Even if gaps in implementation rose beyond mere "imperfection," Plaintiffs have not provided evidence that MDOC or SMT knew of and disregarded the risks of these implementation failures specifically. <u>See Farmer</u>, 511 U.S. at 837. In the absence of evidence that prison officials failed to address deficiencies of which they are aware in the implementation of an otherwise reasonable set of policy directives, an Eighth Amendment claim of deliberate indifference cannot be sustained. <u>See Valentine v. Collier</u>, 956 F.3d 797, 802 (5th Cir. 2020) (staying preliminary injunction against prison officials that had been based on, among other things, implementation failures, because "[t]hough the district court cited the Defendants' general awareness of the dangers posed by COVID-19, it cited no evidence that they subjectively believe the measures they are taking are inadequate").

Here, there is no evidence that MDOC and SMT disregarded implementation deficiencies of which they became aware; leadership at both institutions took ongoing action to prevent and mitigate the spread of COVID-19.

It is uncontested that Washington, for example, issued many DOMs "providing COVID-19 guidance to all MDOC Wardens at all MDOC facilities" and "conducted frequent, usually daily, meetings with facility Wardens and other high-level executive staff to discuss MDOC's ongoing COVID-19 response." Mot. at PageID.3649–3651; Resp. at PageID.5456–5457. Plaintiffs do not argue that Washington was aware of and disregarded implementation failures at SMT.

It is uncontested that Warden Malinda Braman "provided staff and prisoners with masks, instructed staff to provide soap and cleaning materials, and required staff to test negative before

returning to work." Resp. at PageID.5460. Plaintiffs do not argue that Braman was aware of and disregarded implementation failures at SMT.

It is uncontested that Shaver "continued cancellations of group gatherings, permitted bleach to be provided to prisoners, suspended in-person visitation, and created (or maintained) isolation and quarantine areas." Id. The parties agree that Shaver "continued the ban on in-person visitation," "had signs encouraging social distancing in the facility and placed social distancing markings on the floor," and in 2020, "required that [prisoners infected with COVID-19] test negative for two consecutive weeks before being released back into the general population." Mot. at PageID.3655; Resp. at PageID.5462. Shaver testified that "maybe weekly I would see somebody" not wearing a mask or failing to wear a mask properly, but he also testified that "I would correct them, you know, pull your mask up." Shaver Dep. at PageID.5598–5599.[33]

It is uncontested that under LaFave, SMT conducted health screenings prior to staff entering the facility and complied with requirements under the DOM at that time regarding contact tracing and quarantine requirements. Resp. at PageID.5465–5466 (citing LaFave Decl. ¶ 7 (Dkt. 153-2)). While LaFave was Deputy Warden, SMT complied with requirements to set up isolation areas, implemented testing requirements for staff and prisoners, permitted alcohol-based hand sanitizer inside the prison, limited large in-person gatherings, implemented a cohorting plan, prohibited transfers to other facilities unless approved by the Deputy Director, and suspended prisoner copays for COVID-19 testing and management. Id. (citing LaFave Decl. ¶ 7). It is uncontested that LaFave "direct[ed] supervisors and other staff to ensure compliance with social distancing and wearing of face masks." Mot. at PageID.3660; see also Resp. at PageID.5466. It

---

[33] Defendant Lee McRoberts's actions during the COVID-19 pandemic are not addressed in the summary judgment briefing.

is also uncontested that during a January 2022 COVID-19 outbreak, "LaFave did not allow a single SMT staff member testing positive for COVID-19 to report to work." Mot. at PageID.3660; <u>see also</u> Resp. at PageID.5466. Plaintiffs admit that LaFave worked at SMT throughout the entire COVID-19 pandemic and was not aware of any incident in which an SMT staff member with COVID-19 symptoms was allowed into the facility. Mot. at PageID.3661; Resp. at PageID.5467.

And Plaintiffs have admitted that "[w]henever SMT leadership becomes aware of an aspect of the DOM that the facility is not in compliance with, supervisory staff take immediate action to ensure the facility comes into compliance." Mot. at PageID.3681; <u>see also</u> Resp. at PageID.5477.

Plaintiffs' argument that COVID-19 prevention and mitigation measures have not been adequately implemented, therefore, does not demonstrate that Defendants have been deliberately indifferent to the risks posed by COVID-19.

## C. Decreasing Efficacy of Preventative Measures

Plaintiffs also argue that COVID-19 policies at SMT have become less effective over time. Resp. at PageID.5489. As discussed above, staff screening consists of a questionnaire that employees fill out on their computers once already inside the facility, and asymptomatic and mildly symptomatic individuals may be permitted to enter the building. <u>Id.</u> Masks are no longer required in many areas, including the housing units and chow hall at SMT. <u>Id.</u> at PageID.5489–5490 (citing DOM 2022-21R12 at PageID.5685 (describing situations where masks are still required, such as in health care clinics, during transportation, and in the visiting room)). Plaintiffs point out that despite whatever preventative measures Defendants were taking during an earlier phase of the pandemic, SMT suffered a COVID-19 outbreak during the Omicron wave of 2021–2022. <u>Id.</u> at PageID.5492. Given the continued discovery of new variants of the virus, Plaintiffs argue that

"Defendants cannot eliminate the meager measures they had in place during several previous outbreaks at SMT . . . ." Id.

As a result of the purported decreased efficacy of COVID-19 mitigation measures at SMT, Plaintiffs argue that "Defendants' conduct is not akin to the ongoing improvements in the response during the early phase of the pandemic at issue in Wilson." Id. at PageID.5491–5492. Instead, Plaintiffs argue that "Defendants' reduced screening measures is more akin to continuing an ineffective course of treatment." Id. at PageID.5492 (citing Darrah v. Krisher, 865 F.3d 361 (6th Cir. 2017)). In Darrah, the Sixth Circuit reversed the district court's grant of summary judgment in favor of the defendant where an incarcerated plaintiff did not receive any treatment for his psoriasis for three months, and where he was then provided an ineffective medication for ten months rather than the one medication that had proven effective in the past. 865 F.3d at 369–370.

The Sixth Circuit explicitly distinguished the facts in Wilson from those in Darrah, finding in Wilson that (i) the defendants had taken affirmative actions to prevent transmission and to quarantine and treat those who tested positive, (ii) their "actions ha[d] evolved as new guidance . . . emerged," and (iii) the defendants' "ongoing and dynamic response to a novel threat c[ould] hardly be compared to the doctor's lack of response in the face of no improvement in the [incarcerated person's] condition in Darrah." Wilson, 961 F.3d at 843. This logic, which allows prisons to adapt their prevention and mitigation strategies as circumstances related to COVID-19 change, applies here as well. Defendants' elimination of prior mitigation strategies in light of the availability of vaccines and other changing circumstances is insufficient to meaningfully distinguish this case from Wilson.[34]

---

[34] Defendants make two additional arguments.

Although the risk of COVID-19 to prisoners is serious, and although there do seem to have been lapses in Defendants' implementation of measures to address it, binding Sixth Circuit precedent mandates that where a prison has taken reasonable affirmative steps to address the risk, the subjective prong of an Eighth Amendment claim is not satisfied—even if those actions were inadequate, and even if the harm is not ultimately averted. See Wilson, 961 F.3d at 841. Plaintiffs' arguments—that Defendants' prevention measures have not been adequately implemented, that they do not adequately prevent COVID-19 from entering the facility, and that they have become less effective over time—are insufficient to distinguish this case from Wilson. Plaintiffs' critique of Defendants' efforts fails to present triable issues for a factfinder to resolve.

---

First, Defendants argue that their provision of vaccines to incarcerated people demonstrates that they have responded reasonably to the pandemic and that the individual Plaintiffs who have declined the vaccine should not be able to sue Defendants for failing to provide them with other protections. Mot. at PageID.3688–3689. Plaintiffs respond that the vaccines do not prevent all transmission of COVID-19 and that infected individuals remain at risk of "long COVID," so provision of the vaccine "while doing almost nothing to prevent COVID-19 from entering the facility is unreasonable." Resp. at PageID.5495. The Court does not need to decide the significance of offering vaccines alone; Defendants have taken multiple affirmative actions, including the provision of vaccines to those who desire them, to mitigate the impact of the COVID-19 pandemic, and thus have not ignored the risk posed by the pandemic.

Second, Defendants argue that they have responded reasonably to the pandemic by complying with CDC guidelines as those guidelines have evolved over time. Reply at PageID.5795. Defendants are correct that courts have declined to require jails and prisons to implement measures that go beyond current CDC guidelines in order to comply with the Eighth Amendment, see, e.g., Valentine, 956 F.3d at 802. While the CDC guidelines are significant for public health purposes and provide useful guidance as to what constitutes a reasonable response, "compliance (or non-compliance) with CDC guidelines is not dispositive" of Eighth Amendment claims. Charest v. Ivey, No. 20-0214-TFM-N, 2022 WL 819225, at *15 (S.D. Ala. Feb. 7, 2022), report and recommendation adopted, 2022 WL 815018 (S.D. Ala. Mar. 16, 2022); Valentine v. Collier, 978 F.3d 154, 164 (5th Cir. 2020) ("The Eighth Amendment does not enact the CDC guidelines."). While Defendants have clearly utilized various measures suggested by the CDC at different points during the pandemic—including screening, testing, masking, providing vaccinations, cleaning and providing cleaning supplies, and isolation—the Court is unable to determine from the summary judgment record whether current SMT protocols conform completely to current CDC guidelines. Such a determination, however, is unnecessary, given that Defendants have taken various reasonable affirmative actions to address the risks of COVID-19.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 175) is granted.

SO ORDERED.

Dated:  March 23, 2023                          s/Mark A. Goldsmith
       Detroit, Michigan                   MARK A. GOLDSMITH
                                       United States District Judge